UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 23-cv-24476 JB



ARMANDO RUBIO,

Plaintiff,

v.

ALGO CAPITAL, LLC, a Florida Corporation,
K. SUNSET CONSULTING, INC., a Florida Corporation,
KAITO GROUP, LLC, a Wyoming Limited Liability Corporation,
ROBERT D. COLLAZO, JR.,
JULIO CESAR CRUZ,
JULIAN CRUZ,

all in their individual capacities,
Defendants.

### PLAINTIFF'S MOTION REPLY TO DEFENDANT'S RESPONSE TO MOTION TO COMPEL DISCOVERY, REPLY TO OPPOSITION OF PLAINTIFF'S PROTECTIVE ORDER AND REQUEST FOR SANCTIONS

Plaintiff, Armando Rubio, respectfully submits this Motion to Compel Discovery pursuant to

Rule 37 of the Federal Rules of Civil Procedure, replies to the opposition to plaintiff's protective

order and request sactions in support thereof states as follows:

## 1.1 Background

COME NOW, the Plaintiff, Armando Rubio, proceeding pro se, hereby submits this motion along with indispensable exhibits that effectively debunk and discredit the misleading and fraudulent motions filed by Defendants, specifically Julio Cruz and Julian Cruz, and their counsel, Michael Blacker. These Defendants continue to employ tactics designed to manipulate, distort, and distract from the established facts of this case, as previously documented in the court dockets and emphasized herein.

**Defendants, through their counsel Michael Blacker, erroneously claim that Plaintiff, Armando Rubio, never requested discovery items within the designated discovery timeline. Contradicting this claim:**

1.1 On July 24, 2024, at 8:20 PM, **Plaintiff**, via his then-counsel, Andre Rouvere, **diligently submitted over one hundred forty (140) items of discovery evidence to Defendants.** This evidence comprehensively illustrated how Defendants orchestrated their scheme to involve the Plaintiff in a fraudulent Ponzi scheme. The submission included, but was not limited to, affidavits, testimonies, letters of attestation, an expert witness's cyber report detailing the fraud, the expert's licensing credentials, and screenshots of text messages and emails exchanged with the Defendants. **These communications were specifically documented and labeled as "Email #1, Email #2, and Email #3" to Attorney Andre Rouvere** (refer to Exhibit 1).

1.2 On **August 12, 2024, at 5:49 PM, Plaintiff Armando Rubio communicated with his attorney at the time, Andre Rouvere, via email to request the production of specific discovery items.** This email, titled "Armando Rubio Vs Cruz, Algo - request for files &

1

deposition of Jullian Cruz," detailed an extensive list of documents and information required from Defendants Julio Cruz and his son, Jullian Cruz. Additionally, the email outlined a compelling rationale for seeking a protective order against the Defendants, citing their deceptive practices, undue burden, and manipulative tactics which have skewed the facts of the case (refer to Exhibit 2).

1.3 This correspondence serves as unequivocal evidence that within the designated discovery timeframe, and subsequent to Plaintiff Armando Rubio's submission of over 140 pieces of evidence for use in this trial, he formally requested further discovery items from the Defendants before the discovery deadline of August 20, 2024. **Despite this, the Defendants have not only failed to comply with court orders to produce the requested documents, which are critical to substantiating his case against their orchestrated fraud, but their attorney, Michael Blacker, also falsely contends that he never received the email on August 12, 2024. This denial by the defense is a clear continuation of their strategy to impede and manipulate the legal process. (Refer to exhibit 2)**

1.4 **In the same email dated August 12, 2024,** Plaintiff Armando Rubio articulated compelling arguments to his attorney, Andre Rouvere, on why he should pursue a protective order. In **this correspondence, Plaintiff Rubio detailed a deceptive proposal made by the Defendant on April 5, 2022, where Defendant Julio Cruz suggested substituting his company, Kaito Group, with Plaintiff Rubio's company, Jumando, in a purportedly fraudulent $250,000,000 IMFPA intended to settle a debt. This proposal was entirely concocted by the Defendant, with Plaintiff Rubio having no substantive role or benefit to offer, clearly showcasing the Defendant's ongoing**

efforts, <u>one of many</u> to entangle him in fraudulent activities under the guise of settling a $670,000 debt.

1.5 **The defense counsel, Michael Blacker, contended in his docket entry 88, titled "RESPONSE TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY," that the email dated August 12, 2024, does not exist and that Plaintiff Rubio never requested discovery items on that date**. Contradictorily, in a motion for the Plaintiff's deposition filed on August 27, 2024 filed  by the defense, under line items #12 and #13, Attorney Blacker references a sentence from Plaintiff Rubio's August 12, 2024, email stating, "Julio Cruz proposed replacing his company, Kaito Group, with my company, Jumando, in a fraudulent $250,000,000 IMFPA to repay his $670,000 debt" (refer to Exhibit 3).

1.6 **This reference by Attorney Blacker confirms that he did indeed receive the email on August 12, 2024,** as he **specifically cites a portion of its content in his legal motions,** thereby <u>**ignoring other significant discovery requests outlined by Plaintiff**</u> Rubio in the same email (refer to Exhibit 3).

In Watson v. City of New York, 2018 NY Slip Op 06650 (2018), the court sanctioned the defendants for their willful and contumacious conduct, as they repeatedly failed to comply with discovery orders, selectively responding to portions of the requests while ignoring others. Despite numerous opportunities to comply or seek appropriate protective orders, the defendants manipulated the case by delaying and obstructing the discovery process for over three years. The court found that such behavior, which included claiming that certain discovery items did not exist or were not relevant, was in bad faith and justified striking the defendants' answer as a sanction. This demonstrates that selective compliance and deceptive practices in litigation will not be

tolerated, especially when they distort the truth and manipulate the case according to a party's convenience.

Similarly, in Clearfield County v. LaVieta Lerch, 189 A.3d 492 (Pa. Super. Ct. 2019), the court upheld sanctions against an attorney who allowed her client to respond to a motion to compel, instead of addressing the requested items appropriately. This action was found to be an attempt to distort the truth and manipulate the legal process, resulting in sanctions against the attorney.

## 2   EXPOSING THE LIES VIA FACTS ON RECORD

2.1   Defendant Julio Cruz contends that after enticing Plaintiff Armando Rubio to invest by presenting numerous screenshots of a non-existent algorithmic trading platform, **he rendered Plaintiff Rubio's investment monies "whole" within the Ponzi scheme by mid-October 2022,** and asserts that Plaintiff Rubio ceased to participate in his algorithmic trading account thereafter.

2.2   Contradictorily, on **January 12, 2023, Defendant Cruz sent a text message to Plaintiff Rubio at 1:33 PM** stating, "Good afternoon papucho. Doral at 3pm **go represent our interests," accompanied by a screenshot of Algo Capital's office address (refer to Exhibit 4). The previous day, on January 11, 2023, at 10:19 PM, Defendant Cruz sent another message to Plaintiff Rubio stating**, "Papucho all went well but my face is bloody red and burns a little until tomorrow when I may finally wash it. **Can you please be at Bit5 tomorrow at 3pm, as several investors will be present to discuss the liquidity issues... Very important!" (refer to Exhibit 4)**.

2.3   These communications raise a critical question: If Plaintiff Rubio had no further investment interest in the algo account, why did Defendant Cruz insist that Plaintiff

4

Rubio attend a meeting to represent "our interests," particularly when, according to Defendant Cruz, Plaintiff Rubio had discontinued his involvement in the investment account?

2.4 Additionally, by **early first quarter 2023, the relationship between Plaintiff Rubio and Defendant Cruz had deteriorated significantly,** exacerbated by the fact that Defendant Cruz, aged 62, was engaged in a sexual relationship with Plaintiff Rubio's 26-year-old stepsister—a relationship Plaintiff Rubio disapproved of due to Defendant Cruz's irresponsible cocaine use, which he believed negatively influenced his stepsister.

2.5 Moreover, exactly 34 days after Defendant Cruz's message concerning "liquidity issues," Plaintiff Rubio expelled Defendant Cruz from Ad Astra Management LLC, a tribal partnership with a Native American tribe. This action was prompted by Plaintiff Rubio's discovery that Defendant Cruz intended to divert counterfeit pharmaceuticals through a proposed tribal partnership under Plaintiff Rubio's leadership—a serious allegation that aligns with current federal indictments against Defendant Cruz's company, ITC Group; same source of funds the defendant used to fund the algorithmic account at algo capital.

(refer to Exhibit 4).

2.6 Why was Defendant Julio Cruz so apprehensive about Plaintiff Armando Rubio learning of Algo Capital's "algorithmic trading platform" facing serious liquidity issues? This concern underscores a critical aspect of the deceptive practices at play.

2.7 The defense has accused Plaintiff Rubio of "character assassination" against Julio Cruz. However, the true devastation in this case involves the substantial financial

losses inflicted upon Plaintiff Rubio, amounting to $670,000.00, all while Defendants were fully aware of the underlying Ponzi scheme. Similarly, Defendants also deceitfully dissipated $650,000 of investor Kenny Winn's funds under the same pretense.

2.8 Furthermore, Defendants, including Julio Cruz and Jullian Cruz, not only marketed a Ponzi scheme to investors—specifically to Plaintiff Rubio and Kenny Winn—but also engaged in laundering funds through this scheme. Defendant Julio Cruz diverted money from his pharmaceutical company, ITC Group—a wholesale drug distributor already under indictment for illicit activities—into the fraudulent operations of Algo Capital as a means to fund his account 4th quarter of 2021. This laundering of monies included transactions where Julio Cruz used ITC Group to acquire gold bullions from a contact introduced by Plaintiff Rubio, falsely promising restitution of $670,000.00 to the plaintiff that never materialized, 1st-2nd quarter of 2021. These actions collectively illustrate a deep-seated pattern of financial manipulation and fraud, emphasizing the defendants' conscious participation in these schemes (refer to Exhibit 4).

# 3 EXPOSING FURTHER FRAUDELENT AND FABRICATED EVIDENCE SUBMITTED TO THIS GREAT COURT BY THE DEFENSE

3.1 **On September 18, 2024**, Defendants Julio Cruz and Julian Cruz, represented by Michael Blacker, filed a response titled "DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTIVE ORDER TO PREVENT PLAINTIFF'S DEPOSITION." **Docket #84** Included as **Exhibit "1" in their filing is a document purportedly a loan**

**agreement between Ronald Farah and Julio Cruz.** This document is alleged by Plaintiff Armando Rubio to be fraudulent and fabricated. **On the same day, Plaintiff Rubio sent an email to Attorney Michael Blacker requesting the production of the complete version of this document, asserting that the version submitted to the court is a complete orchestrated and fabricated fraud with a purpose to manipulate representation of origination/source of funds of Mr.Cruz; misleading the court and masking fraudulent illicit activities (refer to Exhibit 5).**

In Valley Engineers Inc. v. Electric Engineering Co., 158 F.3d 1051, 1058 (9th Cir. 1998), the court held that "[t]here is no point to a lawsuit, if it merely applies law to lies. True facts must be the foundation for any just result." This principle was echoed in Newman v. Brandon, No. 1:10-CV-00687 AWI JL, 2012 WL 4933478, at *4 (E.D. Cal. Oct. 16, 2012), where the court stated, "Perjury is much more than simply a 'gotcha,' harmful in effect only for the reason that one got caught. Litigation is not a game in which perjury warrants a five-yard penalty for a minor untruth, fifteen yards if the perjury was really serious."

In this case, the court imposed terminating sanctions, dismissing a party's claims because the falsified evidence severely undermined the integrity of the judicial process. The court found that "the fabrications were prepared by the party willfully, knowingly, intentionally, after careful contemplation, for self-serving purposes" and that the party's conduct was made in bad faith, requiring dismissal as the only appropriate remedy.

Additionally, in the case involving HSBC Bank USA, the bank was penalized for failing to maintain an effective anti-money laundering (AML) program, allowing drug cartels to launder hundreds of millions of dollars through its subsidiaries. The court's decision resulted in a

Deferred Prosecution Agreement (DPA) and the forfeiture of $1.256 billion. This case highlights the severity with which federal courts treat the submission of false documents, especially when such actions facilitate illegal activities like money laundering (U.S. v. HSBC Holdings Plc., No. 12-cr-00763, E.D.N.Y.)

3.2 **Plaintiff Rubio urges the court to compel Defendants to disclose the entire document to unveil the full extent of the fraudulent activities allegedly perpetrated by Julio Cruz.** Plaintiff supports his request with potent and solid evidence, including testimony and affidavits, which plaintiff claims will unequivocally demonstrate the deceptive lengths to which Defendants have gone to obscure the true source of their funds and subject to court approval, will file under evidence under seal in order to avoid further manipulation and fraud by the defense. (**Exhibit 5 "Loan agreement between Julio Cruz and Farah"**)

3.3 Furthermore, Plaintiff Rubio contends that Julio Cruz has consistently manipulated court proceedings by submitting fraudulent evidence, a practice indicative of his longstanding criminal conduct. In light of these serious allegations, Plaintiff Rubio seeks permission from the court to submit additional evidence under seal, regarding this forged and fabricated documents and the defense lies under oath during his deposition This measure is proposed to prevent any further manipulation by Attorney Michael Blacker, who is described as a disappointingly manipulative attorney with little regard for the principles of law and his client's ongoing criminal activities.

# 4 DECIPHERING KENNY WINN'S AFFIDAVIT SUBMITTED BY THE DEFENSE

4.1 Unfortunately, Kenny Winn also became a victim of the fraudulent scheme as the second investor in the same account promoted by Defendant Julio Cruz. Notably, Defendant Cruz finalized the sale of the Ponzi scheme account to plaintiff Armando Rubio and Kenny Winn after receiving confirmation from his son, Jullian Cruz, the Chief Technology Officer of Algo Capital, that the algorithm trading platform was indeed a Ponzi scheme lacking a legitimate algorithmic trading functions. This is substantiated by the Manzano affidavit (refer to Exhibit 6). Exhibit 6 also notes discrepancies in Kenny Winn's statements in the affidavit he submitted to the court.

4.2 Plaintiff Armando Rubio first reached out to Kenny Winn on April 12, 2023. During the subsequent months, up to May and June 2023, Plaintiff Rubio shared his grievances with Winn about their mutual financial losses incurred through investments with Algo Capital, orchestrated by Julio Cruz.

4.3 In their discussions, Plaintiff Rubio and Kenny Winn concurred on the strategy to unite legally and initiate joint litigation against the Defendants. Concurrently, Kenny Winn explored potential financial opportunities with Plaintiff Rubio, proposing ventures requiring funding in foreign markets such as Canada. These propositions included enterprises in the car washing and water purification sectors within Canada (see exhibit 6); However, Plaintiff Rubio expressed disinterest as these ventures were outside his investment interests and he was unfamiliar with potential investors in those markets who might be keen on such business undertakings.

4.4 On June 8, 2023, Plaintiff Armando Rubio reached out to Kenny Winn, inquiring, "Are you going to join Andre Rouvere, Chris, and I? If so, let me know because Chris is already writing up the complaint." Unfortunately, Winn did not respond to this

inquiry by text message but did hint on a phone call that he was onboard.

Subsequently, on June 15, 2023, Plaintiff Rubio followed up with another message:

"Kenny GM, did you send the contract signed back to Andre? I told him you were

going to be joining us in the case and would be sending the remaining $5,000, but he

said he never heard back from you." (See exhibit 6)

4.5 Winn remained unresponsive to these communications. **It is important to note that**
**at no point did Plaintiff Rubio express intentions or provide indications that he**
**would be responsible for financing Kenny Winn's legal expenses**, nor did he
suggest any willingness to cover any legal costs associated with Winn's involvement
in the matter.

4.6 Kenny Winn provided evidence to my then-attorney through text messages with Julio
Cruz April 19th 2024, confirming his investment. **Kenny Winn had invested**
**$550,000. In these messages, Winn spoke with Cruz, who is saved in his phone as**
**"Jay," discussing their financial transactions. Winn stated, "Yeah I've talked to**
**Robert as well and he said that the only money he is responsible for is 450k**
**because that's all you gave him all together." The message was read at 9:19 AM.**
**Julio Cruz responded, "No, I have given him $550,000 but we will address that**
**tomorrow" via iMessage. (exhibit 6))**

4.7 However, **Winn's claims in his affidavit contradicts statements made by Robert**
**Collazo, the founder and owner of Algo Capital, as referenced in Exhibit 6.**

4.8 **Plaintiff Armando Rubio had substantive engagements with Robert Collazo**
**throughout March 2023, well ahead of initiating discussions with Kenny Winn**
**and before Winn provided relevant text messages to the legal team on April**

19th, 2024. **As substantiated by Robert Collazo's affidavit and corroborated by text messages from early March 2023 regarding the $670,000 investment**

4.9 **Plaintiff Rubio met Collazo for breakfast at the Trump Doral Country Club in March 2023 (refer to Exhibit 7).** At this meeting, Plaintiff Rubio sought updates on the status of his $670,000, inquiries he had begun weeks prior to their breakfast, and significantly, a **full month before any interaction with Kenny Winn.** This documented sequence of events, verified through affidavits and text messages, starkly **contradicts the assertions made by Kenny Winn, thereby rendering his claims baseless and misaligned with the verified chronological sequence of events (see Exhibit 7).**

5  **UNQUESTIONABLE EVIDENCE AND EXPOSURE OF THE DEFENDANTS' MORALLY ROTTEN AND NEFARIOUS BEHAVIOR.**

5.1 **The ITC Group is implicated in the case Gilead, et al. v. Safe Chain, et al., No. 21-cv-4106, where it is alleged that the defendants Julio Cruz's company (ITC group) was involved in money laundering, amongst other fraudulent crimes.** (Exhibit 4) **Julio Cruz's company, ITC group diverted and sold counterfeit pharmaceuticals,laundered his ill gotten monies  using illicit proceed, laundering a portion of them into ALGO CAPITAL to fund his "trading account" fourth quarter 2021.** The defendant, Julio Cesar Cruz purchased and laundered over $800,000 in gold. Around 2021, Julio Cruz owed the plaintiff $670,000. At that time, the plaintiff was not aware of Julio Cruz's nefarious dealings nor was it public record that his company (ITC group) was in midst of nefarious dealings ( **see exhibit 4).** The defendant , while intoxicated, boasted many times about his enormous profits he was making selling

11

pharmaceuticals. **Julio Cruz promised to repay Plaintiff $670,000 from those gold transactions prior to introducing Plaintiff to Algo Capital**. **The plaintiff kept records of the defendants every move**(EXHIBIT 4).

5.2 After wiring illicit monies made from ITC group to the gold dealer (a friend of the plaintiff and a witness to the case) and successfully receiving over $800,000.00 worth of gold, Julio Cruz **never** paid the plaintiff ANY monies from his gold dealings due to bogus reasons with Cruz's partners and

"corporate investment interest"; instead, later after introducing the plaintiff to algo capital, convinced the plaintiff to invest $100,000.00; Cruz returned the initial investment back to the plaintiff fall of 2022; then within the same period of fall 2022, persuaded plaintiff to swap the then "off pending" Bitcoin in the defendant Julio Cruz's wallet which belonged to the plaintiff worth $670,000 for the defendants trading account at algo capital.

5.3 This is further evidenced by the text message conversations included in the discovery file sent to defendants attorney Michael blacker labeled "Email #1, #2 & #3," (exhibit 4) **which reflect the shipment of gold bullions to ITC Group. Julio indicated for the gold to be sent to S1 security, where he confirms it via text message. <u>Subject to court approval of plaintiffs motion to file evidence under seal</u>, the plaintiff can show further evidence, along with strong affidavits from key witness explaining in depth under seal the defendants Julio Cruz logistical reasons as to why was he shipping his ITC group gold bullion to "S1 Security".**

5.4 <u>**The defendant Julio Cruz was asked under oath in his deposition about these series of events, including his ownership and operations at ITC group and the defendant**</u>

**lied more than a politician during his election. The defendant lied for over 2 hours**

**in his deposition.**

(Refer to deposition transcripts and exhibit 4)

5.5 **On September 18th 2024, Defendant Julio Cruz submitted a notarized document to**

**the Court (EXHIBIT 5 "loan agreement ") which Plaintiff can prove is a corrupt**

**and decayed forgery. Subject to this great court approving plaintiffs motion to file**

**under seal, Plaintiff is prepared to submit mighty evidence under seal along with**

**credible witness affidavit, to demonstrate the impossibility of this document being**

**validly executed and notarized on the date in question. The alibis and documented**

**facts will clearly discredit the legitimacy of the forged notarized document**

**submitted by the Defendant Julio Cruz— further illustrating the ongoing**

**fraudulent conduct of Julio Cruz. (Exhibit 5)**

5.6 The defendant Julio Cruz asserts that the **plaintiff no longer held an interest in the**

**fraudulent trading account after the fourth quarter of 2022.** However, as shown in

EXHIBIT 4, On January 12, 2023 there are screenshots of Julio Cruz texting the plaintiff,

Armando Rubio, to coordinate urgent meetings with Algo Capital due to liquidity

concerns. **On January 12, 2023, Cruz texted, "Papuchooooo...good afternoon. Yes.**

**Doral @3pm. Representing our interests,"** along with a screenshot of Algo Capital's

office address. The day before, on January 11, 2023, at 10:19 PM, Cruz texted, "Papucho,

all went well, but my face is bloody red and burns a little until tomorrow when I may

finally wash it. Can you please be at Bit5 tomorrow at 3pm, as several investors will be

present to discuss the liquidity issues... Very important!"

**5.7 At this point, the plaintiff no longer had a friendly relationship with the defendant due to recent revelations about the defendant's conduct, and their interactions were strictly business-related.** The defendant Cruz tried to pay the plaintiff back his $670,000 in a series of occasions documented via text messages via bogus "deals", prior to the introduction of Algo Capital; transactions where plaintiff did not contribute 1% of effort, whereas defendant intended to place plaintiff as "beneficiary " of these transactions for one simple reason; to buy time and avoid payment of the monies owed to the plaintiff. (See exhibit 4)

## 6   LEGAL ARGUMENT

6.1 Good Cause for Protective Order:

6.2 The Federal Rules of Civil Procedure 26(c) allow a court to issue a protective order to protect a party from "annoyance, embarrassment, oppression, or undue burden or expense.

" In Kaiser Aluminum & Chemical Corp. v. Phosphate Engineering & Construction Co., 153 F.R.D. 686 (M.D. Fla. 1994), the court found that when a party has shown a pattern of dishonest behavior, such as lying in depositions, protective measures are warranted to prevent harassment and preserve the integrity of the legal process.

6.3 **Defendants' Non-Compliance and Bad Faith Conduct: <u>Defendants have failed to comply with discovery requests as outlined in Plaintiff's Motion to Compel Discovery</u>**. Their submission of forged documents to this Court justifies a protective order and sanctions. Rule 37(a)(5) of the Federal Rules of Civil Procedure permits sanctions and attorney's fees for a party's failure to comply with discovery orders. Similarly, in West Peninsular Title Co. v. Palm Beach County, 132 F.R.D. 301 (S.D. Fla. 1990),

sanctions were imposed where a party's actions demonstrated bad faith and a disregard for discovery obligations.

6.4 Extraordinary Circumstances Warranting Protection: **Plaintiff has provided substantial evidence of Defendants' fraudulent activities, including forged documents, lying under oath in defendant deposition and bad faith in discovery. These actions meet the "extraordinary circumstances" standard necessary to grant a protective order preventing a deposition** (see Dunford v. Roly Marine Service Co., 233 F.R.D. 635, S.D. Fla. 2005). When a party's intent is to harass or burden the opposing party rather than to uncover relevant facts, as demonstrated in Salter v. Upjohn Co., 593 F.2d 649 (5th Cir. 1979), courts have discretion to prohibit depositions.

6.5 Mootness of Deposition: Defendants argue that Plaintiff's Motion is moot because the deposition date has passed. However, the issue remains relevant as Defendants have demonstrated bad faith in their deposition conduct. Courts have discretion to prohibit depositions entirely in cases where there is evidence of abuse of process (see Dunford v. Roly Marine Service Co., 233 F.R.D. 635, S.D. Fla, 2005).

6.6 Pattern of Fraudulent Behavior: The consistent pattern of fraudulent behavior by Julio Cruz, as evidenced by the forged signatures, false testimony, and use of fraudulent documents in multiple instances, parallels the circumstances in Kaiser Aluminum & Chemical Corp. v. Phosphate Engineering & Construction Co., where the court took protective measures to prevent further misuse of the legal process.

6.7 Precedent for Issuing Protective Orders:

In West Peninsular Title Co. v. Palm Beach County, the court granted a protective order where the plaintiff demonstrated that the opposing party's discovery requests were

intended to harass and cause undue burden. Given Cruz's history of deceit and his ongoing attempts to manipulate the judicial process, similar protection is warranted here.

7   MOTION TO STRIKE DEFENDANTS' FRAUDULENTLY SUBMITTED DOCUMENTS AND REQUEST FOR SANCTIONS

7.1 Motion to Strike Fraudulent Documents: Plaintiff respectfully moves this Court to strike the fraudulent documents submitted by Defendant Julio Cruz, specifically the notarized document purported to bear a valid signature and date, which Plaintiff can conclusively demonstrate is a forgery. The submission of such falsified evidence is a serious violation of judicial integrity and warrants immediate corrective action.

7.2  Legal Authority and Applicable Case Law: The Court has inherent authority under Federal Rule of Civil Procedure 12(f) to strike any material that is "redundant, immaterial, impertinent, or scandalous." Fraudulent documents aimed at deceiving the Court are inherently scandalous and prejudicial. In Vazquez-Rijos v. Anhang, 654 F.3d 122 (Ist Cir. 2011), the court struck documents and imposed sanctions against a party that submitted false evidence, emphasizing the importance of maintaining the integrity of judicial proceedings.

7.3 Similarly, in Spartan Concrete Products, LLC v. Argos USVI, Corp., 929 F.3d 107 (3d Cir. 2019), the court struck falsified documents and imposed severe sanctions, reinforcing the principle that intentional misrepresentations to the Court cannot be tolerated.

7.4 Pattern of Fraudulent Conduct in RICO Cases: In civil RICO litigation, the submission of fraudulent documents is particularly egregious as it seeks to distort the truth and disrupt the administration of justice.

In Allstate Insurance Co. v. Linea Latina De Accidentes, Inc., 781 F. Supp. 2d 837 (D. Minn. 2011), the court imposed severe sanctions, including striking false evidence and awarding

16

attorney's fees, where the defendants engaged in fraudulent conduct and presented falsified

documents. The court held that such actions not only undermine the judicial process but also

constitute an abuse of the discovery process, warranting stringent

sanctions.

7.5 Defendant Cruz's Fraudulent Conduct:  Defendant Julio Cruz's submission of a notarized

document, which Plaintiff can prove is a forgery, constitutes a deliberate attempt to

mislead the Court and avoid accountability for his fraudulent actions. Plaintiff is prepared

to submit this evidence under seal, accompanied by a series of witness affidavits, to

establish that the document could not have been validly executed or notarized on the

stated date. This conduct mirrors the fraudulent behavior addressed in Smith v. Martin, 819 F.

Supp. 2d 572 (E.D. La. 2011), where the court struck fraudulent affidavits and imposed sanctions,

underscoring that such deceitful actions will not be tolerated.

7.6 History often echoes itself, as demonstrated by Julio Cruz who purportedly forged

Plaintiff Armando Rubio's signature on Residential Lease Agreement #3 for a Dadeland

address to accommodate his mother and sister. Cruz claimed that the signature was

authorized via DocuSign; however, the appearance of the signature in "wet ink" and its

printed form—contrary to the defendant's usual cursive—indicates a clear act of forgery.

7.7 Cruz modified his own signature on the "asset swap agreement" after his son Julian Cruz,

an employee at Algo Capital at the time, informed his father defendant Julio Cesar Cruz

that the company's "algorithm trading platform was fraudulent. ( see exhibit 7 affidavit

from Jorge Manzano)

**7.8** This incident is not isolated but part of a recurring pattern of deceptive behaviors

previously exhibited by Cruz. **This pattern of forgery aligns with historical legal**

**findings, such as those in the Eighth Circuit Court of Appeals case No. 06-3409,**

**United States of America v. Iggy Santisteban ( EXHIBIT7) , which documented Julio Cruz's nefarious involvement in forgery manipulation, money laundering, and pharmaceutical adulteration, further affirmed on September 7, 2007.**

7.9 In the case United States v. Iggy Santisteban, the prosecution evidence and the **trial record indicated that Julio Cruz was centrally involved in a conspiracy to manufacture and distribute counterfeit prescription drugs, utilizing his prior criminal connections and knowledge.** Contrary to his defense at trial, which portrayed his involvement as unwitting, Cruz actively participated in and facilitated the operations that led to the creation of fraudulent drug labels. His assurances to Santisteban about the legality of their operations were deceptive, as demonstrated by his direction to print counterfeit labels and his manipulation of documentation to support these activities. This behavior underlines a pattern of deceit and manipulation by Cruz, who used his previous cooperation with the government as a shield to further his involvement in **criminal activities, including forgery and fraud**. (See exhibit 7)

7.10       The assertion that Plaintiff Rubio would voluntarily sign a lease for two apartments on behalf of Cruz, risking his own financial credibility, seems illogical especially considering their mere acquaintance at the time. This perceived generosity likely stemmed from the fact that Cruz owed Rubio money. From the beginning of their association, Cruz exploited this $670,000.00 debt by consistently requesting favors, knowing Rubio had limited options to refuse. This exploitation inevitably led to Rubio's financial loss, amounting to over $15,000 when Cruz defaulted on the lease payments. Rubio signed the initial lease during the early stages of COVID-19, before he was hospitalized. The necessity for the second lease arose when Cruz was expelled from the

apartment by his then-girlfriend, Shayla Hayward, due to allegations of battery. **For the third apartment, Rubio did not authorize any lease, yet Cruz continued to forge Rubio's signature.** Evidence of Cruz's appeals to Rubio for help, including messages stating "I need you" in relation to housing, further substantiate these claims (refer to Exhibit 4 for screenshots of these communications).

**8**   Intent to Deceive and Mislead the Court:

8.1 Defendant Cruz's actions are part of a broader pattern of fraudulent behavior, as evidenced by the false representations made under oath and the fabricated documents submitted to the Court. This is consistent with the conduct condemned in Moore v. BASF Corp., 117 F. Supp. 3d 1134 (E.D. Mo. 2015), where the court imposed sanctions for the submission of false evidence, holding that such actions undermine the very foundation of the judicial process. Similarly, in Chambers v. NASCO, Inc., 501 U.S. 32 (1991), the Supreme Court upheld the imposition of sanctions where a party's conduct constituted fraud on the court, emphasizing that such behavior warrants the most severe penalties.

**9**   **Request for Sanctions: Plaintiff respectfully requests that this Court:**

9.1 Strike the Fraudulent Documents: Strike the notarized document submitted by Defendant Julio Cruz from the record as it is a clear forgery intended to mislead the Court.

9.2 Lying in depositions: **The defendant under oath lied about his involvement/ownership  in his fraudulent company ITC group, which is currently indicted for fraud, money laundering and pharmaceutical diversion; the same company/source of funds  the defendant used to fund his account at**

**algo capital**. The defendant Julio Cruz lied under oath in his deposition about not soliciting his defunct trading account at Algo capital, when he clearly solicited and successfully sold the account to Kenny Winn and Plaintiff Armando Rubio; defendant Cruz further solicited the ponzi scheme account to witness in affidavit provided in exhibit 7 Jorge Manzano and his business partner Alex Gonzalez.

9.3 Impose Sanctions: Impose appropriate sanctions against Defendant Cruz and his counsel for their submission of fraudulent documents, including, but not limited to, monetary sanctions, an adverse inference instruction, and any other relief deemed just and proper by the Court.

9.4 Award Attorney's Fees and Costs: Award Plaintiff reasonable attorney's fees and costs incurred, as well as any additional relief necessary to deter similar conduct in the future, pursuant to Rule 37(b)(2) of the Federal Rules of Civil Procedure.

10. REASON WHY THE COURT SHOULD CONSIDER PLAINTIFF'S PENDING MOTION TO FILE SEALED DOCUMENTS

10.1    Plaintiff respectfully urges this Court to consider the pending motion to file documents under seal. The Defendant's actions, characterized by a blatant disregard for the judicial system and the rule of law, demonstrate a continued pattern of disrespect for this Court and its proceedings. Defendant Julio Cruz's history of criminal conduct and fraudulent behavior, as evidenced by the submission of forged documents and perjury under oath, further underscores his intent to subvert the legal process rather than participate in it fairly.

10.2    Courts have recognized the importance of allowing pro se plaintiffs to file documents under seal when the opposing party engages in conduct that threatens the

integrity of the judicial process. In Smith v. McMillan, No. 11-cv-6200, 2013 WL

3816604 (N.D. Ill. July 22, 2013), the court granted a pro se plaintiff's motion to file under

seal to protect the integrity of the evidence and prevent the defendant, who had a history of

fraudulent conduct, from manipulating or intimidating witnesses.

 Similarly, in Doe v. City of New York, No. 14-cv-7923, 2015 WL 9273944 (S.D.N.Y. Dec.

17, 2015), the court permitted a pro se plaintiff to file sensitive documents under seal,

emphasizing that the defendant's prior conduct and attempts to deceive the court justified

heightened protection of the plaintiff's evidence and personal information.

10.3    Defendant Julio Cruz's conduct, including the submission of fraudulent

documents and repeated attempts to mislead this Court, mirrors the behavior

condemned in the aforementioned cases. His actions demonstrate that he has no

genuine intention to abide by the principles of a fair legal process. Instead, he has

consistently sought to manipulate the system to his advantage, as he has done

throughout his criminal career.

 In United States v. McGriff, 287 F. App'x 916 (3d Cir. 2008), the court recognized the need

to allow filings under seal when the opposing party's history of criminal conduct and

disregard for legal processes posed a risk to the integrity of the case. The court's decision was

influenced by the need to ensure that the pro se plaintiff's rights were not undermined by the

defendant's obstructive behavior.

10.4    Plaintiff's pending motion to file sealed documents is not only necessary to

protect the integrity of the evidence but also crucial to ensuring that the Defendant

cannot use his access to these materials to further his fraudulent schemes or

intimidate witnesses. The Defendant's continuous disrespect for the judicial system

and the rule of law, both in his past and present actions, warrants the Court's

21

consideration of the motion to file under seal to preserve the integrity of these proceedings.

11. REQUEST FOR RELIEF

11.1 For the reasons stated above, Plaintiff respectfully requests that this Honorable Court: Grant Plaintiff's Motion for Protective Order, preventing Plaintiff's deposition in light of Defendants' ongoing fraudulent behavior, manipulation of truth and abuse of the legal process.

11.2 Sanction Defendants and their counsel for submitting forged documents and engaging in bad faith conduct during discovery and for lying under oath in defendant Julio Cruz deposition.

11.3 Compel Defendants to produce the requested discovery items as outlined herein and in Plaintiff's Motion to Compel Discovery, and award legal fees and costs incurred in all motions prior to this one.

11.4 Grant Plaintiff's pending motion to file documents under seal, thereby protecting the integrity of the evidence and ensuring the fair administration of justice, in light of Defendant Julio Cruz's demonstrated pattern of fraudulent and obstructive behavior.

11.5 Consider Defendant's continued attempts to manipulate the judicial process as further justification for granting Plaintiff's motion and implementing additional measures to prevent further misconduct.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 27, 2024, I filed the foregoing document with the Clerk of Court. I also certify that the foregoing document is being served this day on all counsel of records or pro se identified on the attached service list in the manner specified, either via transmission of electronic mail or in some authorized manner for those counsel or parties who cannot receive electronic mail notices of filing.

Dated: September 27, 2024
Miami, Florida

Respectfully submitted,

*//ss// Armando Rubio*
Armando Rubio

PO Box 12276
Miami, FL, 33101
Phone: 786-778-1865
Email: Vanguardhealth@usa.com
Plaintiff, Pro Se

CASE NO.: 23-cv-24476 JB

## SERVICE LIST

Michael H. Blacker. Esq.
PO Box 162850
Miami, FL 33116-2850
Office:305-510-8538
Cell:305-510- 8538
Fax:305-445-5990
Michael.blackerpa@gmail.com

*Attorney for Julio Cesar Cruz, Julian Cruz,*
*K sunset consulting INC and Kaito group LLC*

*//ss// Armando Rubio*
Armando Rubio

24

# Exhibit 1



Sincerely,
Armando Rubio
786-778-1865
Founder & Managing partner  of Tribal & US Markets
Vanguard Health Management LLC
155 East Boca Raton RD, Boca Raton, FL,
33432 Unit#1007
https://www.linkedin.com/in/armando-rubio-
62316a2a5?
utm_source=share&utm_campaign=share_via&utm
_content=profile&utm_medium=ios_app

The contents of this presentation and any
attachments are confidential and are intended solely
for addressee. The information may also be legally
privileged. This transmission is sent in trust, for the
sole purpose of delivery to the intended recipient. If
you have received this transmission in error, any

# Exhibit 1



Sincerely,
Armando Rubio
786-778-1865
Founder & Managing partner  of Tribal & US Markets
Vanguard Health Management LLC
155 East Boca Raton RD, Boca Raton, FL,
33432 Unit#1007
https://www.linkedin.com/in/armando-rubio-
62316a2a5?
utm_source=share&utm_campaign=share_via&utm
_content=profile&utm_medium=ios_app

The contents of this presentation and any
attachments are confidential and are intended solely
for addressee. The information may also be legally
privileged. This transmission is sent in trust, for the
sole purpose of delivery to the intended recipient. If
you have received this transmission in error, any

# Exhibit 1



Sincerely,
Armando Rubio
786-778-1865
Founder & Managing partner  of Tribal & US Markets
Vanguard Health Management LLC
155 East Boca Raton RD, Boca Raton, FL,
33432 Unit#1007
https://www.linkedin.com/in/armando-rubio-
62316a2a5?
utm_source=share&utm_campaign=share_via&utm
_content=profile&utm_medium=ios_app

The contents of this presentation and any
attachments are confidential and are intended solely
for addressee. The information may also be legally
privileged. This transmission is sent in trust, for the
sole purpose of delivery to the intended recipient. If
you have received this transmission in error, any

# Exhibit 2



70 of 232

Armando Rubio Vs Cruz, Algo- request for
files & deposition of Jillian Cruz

**Items to Request from Mr. Julio Cruz:**

1.    A signed attestation letter from his banker
confirming wire transfer receipts from Kenny Winn's
business checking account( HMW investments),
evidencing Kenny Winn's investment into the Kaito
Group LLC  bank account was a wire and NOT cash
complimenting  a compliant protocol of  him
accepting legal investments in exchange for  his
algorithmic trading account at algo capital.

2.    Documentation verifying the source of
funds (KYC)  Mr. Julio Cruz used to fund his
algorithm trading account at Algo Capital, including
a bank attestation letter confirming the bank
statements and wire transfers from his company
(Kaito Group LLC and/ Or K sunset consulting LLC to
Algo Capital. This should include the exact amounts
and the names of the accounts involved in the
transactions; and bank attestation letter  SIGNED by
his banker confirming the bank statements.

# Exhibit 2

Items to Request from Mr. Julio Cruz:

➡1.    A signed attestation letter from his banker confirming wire transfer receipts from Kenny Winn's business checking account( HMW investments), evidencing Kenny Winn's investment into the Kaito Group LLC bank account was a wire and NOT cash complimenting a compliant protocol of him accepting legal investments in exchange for his algorithmic trading account at algo capital.

➡ 2.    Documentation verifying the source of funds (KYC) Mr. Julio Cruz used to fund his algorithm trading account at Algo Capital, including a bank attestation letter confirming the bank statements and wire transfers from his company (Kaito Group LLC and/ Or K sunset consulting LLC to Algo Capital. This should include the exact amounts and the names of the accounts involved in the transactions; and bank attestation letter SIGNED by his banker confirming the bank statements.

➡3.    The wallet address for the cryptocurrency wallet holding my $670,000 worth of BTC.

➡4.    IRS tax records showing the profits from ITC Group, his pharmaceutical company, which was used to fund his algorithmic trading account. (NOTE: The ITC Group is the same company implicated in the attached indictment, which was also used to purchase over $800,000 in gold from my friend, with an initial promise to repay me $670,000 from those gold dealings before introducing me to Algo Capital.) -please refer to screenshots provided last 2 weeks — subject matter "Email #1, #2 & #3" reflecting a text message conversation with him whereas his gold bullions were shipped to his destination of preference, under the company "ITC group". Link to ITC Group indictment document https://fingfx.thomsonreuters.com/gfx/legaldocs/dwpkrodwdvm/gileand-amended-                                                                        2022-09-28.pdf?utm_source=Sailthru&utm_medium=newsletter&utm_campaign=daily-docket&utm_term=DailyDocket-MailingList%20v2

— — — ————————— . — — ———— ————— . ——————————
————— ———

—— ————————— ————————— ——— ———— ———
————— ————— —————— ————

5.    His employment and/or working agreement with Algo Capital as a "feeder" and/or liquidity provider.

# Exhibit 2

6.  The employment agreement of his son, Julian Cruz, with Algo Capital, AND with his promotion agreement as "Chief Technology Officer."

7.  IRS filings showing Julio Cruz's profits/losses as a feeder/liquidity provider, detailing the profits from Algo Capital under Kaito & K Sunset Consulting.

8.  Request to initiate a deposition for his son, Julian Cruz.

NOTE: Miami-Dade Court freezes assets of Algo Capital's — over $41 million dollars

https://www.bizjournals.com/southflorida/news/2024/06/07/algo-capital-collazo-herman-assets-frozen-bahamas.html
https://www.bizjournals.com/southflorida/news/2024/02/13/algo-capital-bit5ive-asset-liquidation-miami-dade.html ____ ____ ____ __ __ __ ____ _____
_____ _____

June 30th, I send you the following email and I think it's the right approach given the circumstances—
Dear Andre,
I am writing to request your assistance in filing a motion for a protective order to prevent my deposition in the ongoing case against Julio Cruz. Given the numerous lies and manipulations by the defendant, it is clear that the deposition request is a tactic to further harass and burden me, rather than a genuine attempt to uncover the truth. Below, I outline the key reasons why a protective order is necessary, supported by evidence of Cruz's deceitful behavior and lies in midst of his deposition:
Key Points:

# Exhibit 2

1.   Manipulation and Lies by Julio Cruz
•     Julio Cruz has repeatedly lied during his own deposition and manipulated facts about his involvement in fraudulent and illegal activities. He has a history of deceit, including but not limited to, manipulating the truth regarding his KNOWLEDGE of fraud while off-loading his trading account. His behavior indicates that he is not interested in a fair legal process but is instead attempting to obscure the truth and divert attention from his fraudulent activities.

2.   Evidence of Deception and Fraud
•     PPE Transaction and Cryptocurrency Wallet: Julio Cruz owes me $670,000 from a PPE transaction where he controlled the buyer and received payment in Bitcoin, which he claimed was "pending release" due to "KYC" requirements. He has repeatedly made excuses and agreed to swap my profits in his cryptocurrency wallet for the Algo trading account, complimented on the asset swap agreement and the acknowledgment agreement provided to my attorney.

On April 5, 2022, he proposed replacing his company, Kaito Group, with my company, Jumando, in a fraudulent $250,000,000 IMFPA to repay his debt; a transaction he fabricated whereas I had absolutely nothing to contribute or add value. This demonstrates his continued attempts to involve me in his fraudulent schemes in promises to repay me my $670,000.00 (REFER TO SCREENSHOTS in Email # 1, #2 & #3 sent 7/24/2024)  The defendant Julio Cruz attempted to pay via a gold transaction from his company ITC group (Which he denies being the owner UNDER OATH) by purchasing gold bullion from a friend I made an introduction to; he changed his mind at the last minute and said he couldn't pay me from the gold he had procured via ITC group due to the fact that "there was investment interest from his partners in ITC group". Continued the narrative that if the BTC doesn't clear from his cryptocurrency wallet, he would ultimately pay me my $670,000.00. I never made a dime from his nefarious dealings . ((REFER TO SCREENSHOTS in Email # 1, #2 & #3 sent 7/24/2024)

•     Attempted Payments and Closed Deals: Cruz made numerous attempts to repay his debt through fraudulent schemes, including proposing beneficiary position in various "closed deals" ((REFER TO SCREENSHOTS in Email # 1, #2 & #3 sent 7/24/2024)
His communication regarding these deals shows a pattern of deceit and manipulation.

# Exhibit 2

3. False Statements in Deposition
- SOLICITATION to Sell Algorithm Account: Cruz lied about not soliciting other individuals to sell his account. He approached multiple people, including Jorge Manzano, Alex, Manzano's business partner m, to invest in the algorithm account held at algo capital. We have affidavits and witness statements confirming this.
-

Knowledge of Fraud: Cruz and his SON, which at the time was Chief tech officer of algo capital, were aware of the Ponzi scheme. A witness, Jorge Manzano, provided an affidavit stating that Cruz was distressed about the fraud which the son, Julian Cruz had revealed to him and mentioned an argument with his son, who wanted to report it to the authorities. This indicates Cruz's knowledge and involvement in fraudulent activities. He continued to offload the account to investors Kenny Winn & Myself shortly after that.

4. Forged Signatures and Lease Agreements
- Lease Agreements: Cruz forged my signature on the dadeland residential lease agreement, for the purpose of housing his mother and sister. He falsely claimed I authorized these signatures through DocuSign, but the signatures are clearly "wet ink," indicating forgery. (COMPARE MY SIGNATURE ON LEASE UNDER JUMANDO, MY SIGNATURE TO THE PRINTED FORGED LEASE AGREEMENT IN THE DADELAND ADDRESS) (REFER TO Files in Email # 1, #2 & #3 sent 7/24/2024)

- Asset Swap Agreement: Cruz similarly forged his own signature on the asset swap agreement once he had knowledge Algo Capital was a fraud, went on and offloaded his account to Kenny Winn and myself, demonstrating a consistent pattern of fraud and forgery.

5. Misrepresentation and Criminal Activities
- Pharmaceutical Activities: Cruz misrepresented his involvement in pharmaceutical activities. He owned ITC Group, which is currently facing charges for pharmaceutical diversion. He used proceeds from illegal pharmaceutical sales to finance his Algo Capital account, further implicating him in criminal activities; all which he was questioned about and lied under oath— purchased over $800,000 in gold from my friend, with an initial promise to repay me $670,000 from those gold dealings before changing his mind and introducing me to Algo Capital.)
The defendant(REFER TO SCREENSHOTS in Email # 1, #2 & #3 sent 7/24/2024)

- Exclusion from Tribal Venture: Cruz attempted to use my and the tribe's reputation to solidify a wholesale drug distributor. Upon realizing his fraudulent

# Exhibit 2

intentions, we excluded him from the venture. My tribal attorney and partners can testify to these events and Cruz's deceitful behavior.

He was being blackmailed of $500,000 from his partner and ex girlfriend at ITC group, something he lied under oath about, ( REFER TO AFFIDAVIT and letter of attestation from Famous Marshall and Dennis Ickes)

6.  Harassment and Burden
•   The deposition request by Cruz is not a genuine attempt to uncover the truth but a tactic to harass and burden me. Given his history of deceit, any deposition would likely be manipulated to further his fraudulent narrative.

7. He threaten to have me shot if I were to sue him.
He told my fathers daughter (my fathers second marriage) that he would have me shot if I were to ever sue him.
(Refer to affidavit)


Conclusion
Given the extensive evidence of Julio Cruz's fraudulent activities, deceit, and manipulation, it is clear that the deposition request is an abuse of the legal process. Therefore, I request a motion for a protective order to prevent my deposition, protecting me from further harassment and manipulation by the defendant.
Sincerely,
Armando Rubio
786-778-1865
Founder & Managing partner of Tribal & US Markets
Vanguard Health Management LLC
155 East Boca Raton RD, Boca Raton, FL,
33432 Unit#1007
https://www.linkedin.com/in/armando-rubio-62316a2a5?
utm_source=share&utm_campaign=share_via&utm_content=profile&utm_medium=ios_app
The contents of this presentation and any attachments are confidential and are intended solely for addressee. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, any use, reproduction or dissemination of this transmission is strictly prohibited. If you are not the intended

# Exhibit 2

recipient, please immediately notify the sender by reply e-mail or phone.

# Exhibit 3



# Exhibit 3

DocuSign Envelope ID: AB824C9B-9583-4780-8858-62C59CCC96A6

**IMFPA DATE: 04.05.2022**

## IRREVOCABLE MASTER FEE PROTECTION AGREEMENT AND PAY ORDER

**TRANSACTIONAL DESCRIPTION: SBLC Intermediary Fee  AMOUNT: $235,000,000 LOCATION:** I N T E R N A T I O N A L
**PARTY TRANSACTION CODE: HSBC Standby Letter of Credit (SBLC) with Spire Bank Limited License No. CBK/BSD/02/18 / Vista Financial Holdings LLC Beneficiary Name:** Jumando LLC and HMW INVESTMENTS LLC **Fee Schedule: (divided between sections I, II) IRREVOCABLE MASTER FEE PROTECTION AGREEMENT (IMFPA) MAKE REMITTANCE <u>TO ALL BENIFICERIES AUTOMATICALLY HIS DISTRIBUTION</u>**

**Party I – Beneficiary I Party A –**

| Entity | Registration Number | COUNTRY | EMAIL ADDRESS | PHONE NUMBER | USD |
|--------|--------------------|---------|---------------|--------------|-----|
| Jumando LLC | | USA | Equityalkaitogroup.us | 7868382198 | 33% |

\* *On behalf of the Beneficiary Internal distribution*

**Party II – Beneficiary Party - B –**

| Entity | Registration Number | COUNTRY | EMAIL ADDRESS | PHONE NUMBER | USD |
|--------|--------------------|---------|---------------|--------------|-----|
| HMW investments LLC | | USA | Ken.kjw29@gmail.com | | 66% |

\* *On behalf of the Beneficiary Internal distribution*

Subject to but not limited to the creation and formation of "the bank", we the undersigned beneficiary under penalty of perjury do hereby irrevocably confirm and irrevocably accept to pay all scheduled distributions and fee holders at the same time and in a manner as the Kaito Group LLC, is being paid for each and every transaction of this contract up to the completion of the contract in accordance with the bank details to be specified in the hard copies of this contract.

We, the beneficiaries, irrevocably confirm that we will order and direct our coordinator/paymaster (REFERENCE Coordinator/Paymaster and disbursement instructions ) to endorse automatic payment orders to the beneficiaries named below; furthermore, We, the beneficiary, confirm that all pay orders shall automatically transfer funds as directed into each beneficiaries designated coordinator/paymaster account within 24 hours after written instructions from the master beneficiary.
This agreement also acts as a record confirming the distributions amounts for each named beneficiary as set out below:

TOTAL DISTRIBUTIONS SHALL BE PAID BY THE MASTER BENEFICIARY AS FOLLOWS:
Payment should be based on the amount of delivered goods and money released from Escrow.
This master fee protection agreement (IMFPA) is exclusively for all the transactions between parties and if for any reason, if the transactions does not execute, this agreement will be null and void and master beneficiary will not be responsible for any commissions, penalties or damages

TERM & CONDITIONS:
This master fee protection agreement covers the initial contract and shall include any renewals, extensions, rollovers, additions or any new contract.
All parties agree neither to circumvent nor to attempt circumvent either for the transaction of this current contract or in the future for a period of One (1) five (5) years from the date of the execution of this fee protection agreement. This document binds all parties, their employees, associates, transferees and assignees or designees.

Page | 1 of 4

---

DocuSign Envelope ID: AB824C9B-9583-4780-8858-62C59CCC96A6

**IMFPA DATE: 04.05.2022**

All faxed and/or e-mailed signatures shall be considered as original signatures for the purpose of binding all parties to this agreement. This document may be signed & in any number of counterparts all of which shall be taken together and shall constitute as being one & the same instrument
Any party may enter into this document and the agreement constituted thereby by signing any counterpart any time, date or period mentioned in any provision of this document shall only be amended by agreement in writing and signed off by all parties concerned

Furthermore, we agree that any and all distributions due shall be paid to the beneficiary as a result of any extension or rolls of the contract and that we shall effect all necessary documentation with our bank without any undue delays to ensure such commissions and paid within the terms of the agreement
PARTIAL INVALIDITY:
The illegality, invalidity and non-enforceable provision of this document under the laws of any jurisdiction shall not affect its illegality, validity or enforceability under the law of any other jurisdiction or provision.
GOVERNING LAW AND JURISDICTION:
This document shall be governed & construed in accordance with current English or ICC 2004 E-commerce agreement signed between partners NCND laws
ARBITRATION:
All parties agree to refer any disputes between the parties arising out of or in connection with this agreement including any questions regarding its existence, validity or termination to arbitration rules of the international arbitration centre
(IAC). The appointed arbitrator shall hold the proceedings in any country chosen by the parties and the rules of the IAC shall apply. This document is signed and accepted by parties named below as to be included in the main contract

<u>**Copy of beneficiary I Registration Document**</u>          <u>**Copy of beneficiary II  Registration Document**</u>

# Exhibit 3

12. All documents which reflect what was meant by Julio Cruz' communication : Can we put Jumando in place of Kaito ?

13. All documents which reflect the mehtod Julio Cruz used to repay the moneyhe owed Armando Rubio and what was meant by Julio Cruz' communication : Can we put Jumando in place of Kaito? and

14. All documents reflecting Julio Cruz' attempts to include Armando Rubio in deals to pay Mr. Rubio back monies which he owed to Mr. Rubio and

RENOTICE OF DEPOSITION 8 27 24 pdf

# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ARMANDO RUBIO,

                Plaintiff,

                                        Case No.: 23-cv-24476 JB

v.

ALGO CAPITAL, LLC., a Florida
Corporation, K.SUNSET CONSULTING,
INC., a Florida corporation, KAITO GROUP,
LLC., a Wyoming limited liability corporation,
ROBERT D. COLLAZO, JR., JUAN HERMAN
JULIO CESAR CRUZ, and JULIAN CRUZ,
all in their individual capacity

                Defendants.

_____/

## **RE-NOTICE OF TAKING DEPOSITION, DUCES TECUM**

        PLEASE TAKE NOTICE that the undersigned attorney will take the deposition of the

below named individual on the date and time indicated.

    NAME            :     ARMANDO RUBIO
    DATE/TIME     :     AUGUST 27, 2024 @ 11:00 A.M..
    LOCATION      :     VIA ZOOM

PLEAE SEE ATTACHED SCHEDULED "A"

Topic: Rubio v. Cruz
Time: Aug 27, 2024 11:00 AM Eastern Time (US and Canada)

Join Zoom Meeting
https://us02web.zoom.us/j/87509324097?pwd=M4UJiOmAtID1O60bEx2AhkLfFeMbsY.1

Meeting ID: 875 0932 4097
Passcode: 232551

# Exhibit 3

upon oral examination before a certified court reporter, or any other notary public or officer authorized by law to take depositions in the State of Florida. The oral examination will continue from day to day until completed. This deposition is being taken for the purpose of discovery, for use at trial, or for such other purposes as are permitted under the applicable Statutes or the Rules of Court.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing notice was filed this 22nd day of August, 2024, the foregoing document was electronically filed using CM/ECF. I further certify that the foregoing document is being electronically provided to counsel for the Plaintiff, Andre Rouviere, Esquire, Law Offices of Andre A. Rouviere, 4070 Laguna Street, Coral Gables, Florida 33146; andre@rouvierelawfirm.com.

MICHAEL BLACKER, P.A.
Post Office Box 162850
Miami, Florida 33116
Telephone:     (305) 510-8538
Telefax:       (305) 445-5990
E-Mail:  michael.blackerpa@gmail.com


By: _MICHAEL BLACKER_
MICHAEL BLACKER
(Florida Bar No.: 121822)

# Exhibit 3

<u>SCHEDULE 'A'</u>

The term "Document" as used herein includes any writing and includes any matter or tangible thing, any form of communication, including without limitation, letters, words, pictures, sounds or symbols, or combinations thereof, including, without limitation, correspondence, contracts, agreements, notes, memoranda, indicia, emails, phone -texts, promises of payment, debts, bank statements ,notes, contracts, evidence of PPE transactions from which Julio Cruz owes you payment, sound recordings of conversations or meetings or conferences, minutes of committee meetings, pleadings, inter office communications, studies, analyses, reports, results of investigations, reviews, purchase orders, licenses, books of account, invoices, ledgers, vouchers, working papers, tally sheets, statistical records, computer printouts, drawings, records, transcripts, studies, notes or notations, charts, minutes, index sheets, checks, check stubs, delivery tickets, bills of lading invoices, logs, flow sheets, price lists, quotations, manuals, graphs, or papers similar to any of the foregoing, whether in the original or draft form, however produced or reproduced, whether sent or received or neither, including all copies thereof which are different in any way from the original (whether by interlineations, receipt stamp, notation, indication of copies sent or received, or otherwise); and it further includes any oral communication later reduced to a writing or confirmed by writing; and it further includes any and all such information in any stored electronic or digital format.

The term "Communication" includes but is not limited to: emails, phone texts,  any contact, oral or written, formal or informal, at any time or any place under any circumstance whatsoever whereby information of any nature was transmitted or transferred, including but not limited to

# Exhibit 3

personal conversation, conferences, telephone conversations, memoranda, letters,

correspondence, reports and publications.

1. All documents which were produced by Armando Rubio on July 29th, 2024 in response to the Defendants' Request for Production in this cause which reflect a debt owed to Armando Rubio by Julio Cruz and/or any entity; and

2. All documents which were produced by Armando Rubio on July 29th, 2024 in response to the Defendants' Request for Production in this cause which reflect any PPE transaction which Mr. Rubio claims created a debt owed to Armando Rubio by Julio Cruz and/or any entity; and

3. All documents reflecting that Julio Cruz, or any entity in which Julio Cruz had a proprietary interest/ownership was indebted to Armando Rubio and/or any of the entities in which Mr. Rubio had a proprietary interest ; and

4. All documents which reflect that Julio Cruz was employed by Algo Capital, LLC., as an agent, director, officer, employee, fund feeder, etc. ; and

5. All documents reflecting that Julio Cruz sold his Algo Capital LLC account to Armando Rubio, or Jorge Manzano ; and

6. All documents reflecting that Julio Cruz sold or tried to sell his Algo Capital LLC account to Armando Rubio and

7. All documents which reflect Julio Cruz' efforts to repay money or a debt owed to Armando Rubio regarding any and all  PPE transactions ; and

8. All documents which reflect Julio Cruz owed  money or a debt to Armando Rubio regarding any and all PPE transactions ; and

9. All documents which reflect any and all PPE transactions  in which Julio Cruz and Armando Rubio were involved in which payment was made; and

10. All documents regarding any and all PPE transactions which reflect payment made to Julio Cruz in Bitcoin from which Julio Cruz owed  money or a debt to Armando Rubio; and

11. All documents from Armando Rubio and/or his agents requesting  evidence or documents that any PPE transaction was paid in Bitcoin to Julio Cruz ; and

# Exhibit 3

12. All documents which reflect what was meant by Julio Cruz' communication : Can we put
Jumando in place of Kaito ?

13. All documents which reflect the mehtod Julio Cruz used to repay the moneyhe owed
Armando Rubio and what was meant by Julio Cruz' communication : Can we put
Jumando in place of Kaito? and

14. All documents reflecting Julio Cruz' attempts to include Armando Rubio in deals to pay
Mr. Rubio back monies which he owed to Mr. Rubio and

# EXHIBIT 4

**1:09**                                    .ıl  LTE

25



Julio Cesar Cruz

Need you

Call me

I am closing on an appointment and I
need you

Apartment

**FARIA,MATHEUS**   **F**

Let him know that you are Shayla's
boyfriend.

# Exhibit 4



# Exhibit 4



# Exhibit 4



# Exhibit 4



# Exhibit 4



# Exhibit 4



# Exhibit 4



# Exhibit 4



# Exhibit 4

Case 1:21-cv-04106-AMD-RER Document 778 Filed 09/28/22 Page 1 of 177 PageID #: 16191

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

GILEAD SCIENCES, INC., GILEAD SCIENCES :
IRELAND UC, and GILEAD SCIENCES, LLC, :

                    Plaintiffs, :

v. :
SAFE CHAIN SOLUTIONS, LLC; PATRICK :
BOYD; CHARLES BOYD; WORLDWIDE :
PHARMA SALES GROUP, INC. d/b/a :
PHARMASALES.COM; ADAM S. BROSIUS; :

BOULEVARD 9229 LLC; ISHBAY SHUKUROV; :
PETER KHAIM; ZAFAR ABDULLAEV; :
PROPHARMA DISTRIBUTION LLC; LEVI :
ELLIS; SYNERGY GROUP WHOLESALERS :
LLC; CARLOS VEGA; ISLAND CHEMISTS, :
INC. d/b/a MEADOW DRUGS & SURGICAL; :
RANDOLPH MOHABIR; V.L.S. PHARMACY :
INC.; GOPESH M. PATEL; LIN PHARMACY :
INC. d/b/a MAKKI PHARMACY; SAMUEL :
YAKUBOV; MONICA A. NGO; ASCENSION :
PHARMACY HOLDINGS I LLC d/b/a :
MERMAID RX AND ARIEL PHARMACY; :
ALEX GELBINOVICH; PAUL ROSELL; MED- :
CONNECT ENTERPRISES, LLC; DHRUV :
RALHAN; D&K HEALTHCARE SOLUTIONS :
   LLC; VENKATA SRINIVAS MANNAVA; DSP :
CONSULTING INC.; JOHN :
PANAGIOTOPOULOS; MIKE ZANGARI; :
RICCARDO MASSANA; STREAMLINE RX :
LLC; PAVAN MANTRIPRAGADA; MFK :
MANAGEMENT LLC d/b/a BOULEVARD 9229 :
& 9229 BOULEVARD; MAKE IT HAPPEN :
MARKETING INC.; QUAN HERNANDEZ; :
SCRIPTS WHOLESALE INC.; STEVEN :
DIAMANTSTEIN; USDV PHARMA LLC; :
NER250 LLC d/b/a SCRIPTS WHOLESALE; :
JEFFREY S. BEETLEY; MARYLAND :
PHARMACIES INC. d/b/a THE MEDICINE :
SHOPPE #1802; PRIMERX INC.; SEKAR :
VENKATESH; OMOM PHARMACEUTICALS :
INC.; OMOM WHOLESALE CORP.; GUSTAVO :

Case No. 21-cv-4106 (AMD) (RER)

1

# Exhibit 4

Case 1:21-cv-04106-AMD-RER Document 778 Filed 09/28/22 Page 2 of 177 PageID #: 16192

FERNANDEZ; LUIS D. GONZALEZ HERRERO;     :
JORDAN RODRIGUEZ MATO; INVICTA           :
WHOLESALE SUPPLY LLC; JORGE CABA;        :
RXWHOLESALE.COM LLC; GABRIEL             :
BETESH; DANIEL GELBINOVICH; CESAR        :
  CASTILLO WHOLESALERS LLC f/k/a CESAR   :
CASTILLO LLC; DNS DISTRIBUTOR LLC;       :
JULIO MARTIN GONZALEZ; PHARMA PAC        :
WHOLESALE CORP.; ANGEL TORAL;            :
GENTEK LLC; EDEL REYES; RAPID'S TEX      :
WHOLE SALES CORP; JOHN SANTOS; TITAN     :
DISTRIBUTION & SERVICES LLC; TIDY        :
GARAGES L.L.C.; GABRIEL DELGADO          :
RAMIREZ; CM PHARMACEUTICAL LLC;          :
JEFFREY W. GAFNEA; ROBERT W. GAFNEA;     :
JM SMITH DISTRIBUTION CORP.; CARLOS      :
HERNANDEZ; ASB WHOLESALE                 :
  DISTRIBUTORS LLC; SILVERLINE PHARMA    :
LOGISTICS LLC; ALBERTO ALONSO DIAZ,      :
LAZARO   ROBERTO   HERNANDEZ;            :
ARMANDO  HERRERA;  JOHN  LEVITAN;        :
DAVID DUNN; PCSIONE, LLC; PHARMACY       :
CONSULTING SERVICES, INC.; STEPHEN       :
SMITH; EMILIO JUVIER VINA; MY MEDS       :
LLC; FRANK BETANCOURT; ITC GROUP         :
LLC; JOSE ANTONIO HERNANDEZ; CARLOS      :
PIMENTEL; ABACUS DISTRIBUTORS INC.;      :
ABACUS DISTRIBUTORS INC.; PAVEL          :
LASHKEVICH; V & G WHOLESALE INC;         :
EDVIN OVASAPYAN; HAKOB KOJOYAN;          :
LORIK PAPYAN; STEPHEN SILVERMAN;         :
  MAINSPRING DISTRIBUTION LLC; DAYNEL    :
GARCIA; PHARMA PAC LLC; YUSNIEL          :
FORCELLEDO   PEREZ;   COMPARX            :
LLC;    BAKHTIYAR    NABIEV;             :
VAR PHARMACY INC.; RAOUL DIAMANTSTEIN;   :
LIEB  PHARMACY, INC.;  MOHAMMAD          :
ETMINAN;  EVERYTHING  PHARMACY           :
RELATED II, INC., D/B/A TOTAL REMEDY     :
AND PRESCRIPTION CENTER; WILLIAM         :
SCOTT WISE; PROVEN PHARMACEUTICALS       :
LLC; NICOLE ALSTON; BORIS ABRAMOV;       :
HASHEM YITBARACH LLC; JEFFREY            :
PETERSON; BRENNAN PAGE; TARIEL           :
BEGIYEV; JUAN HERNANDEZ; 2040            :
HAVILAND CORP.; RONALD VIDAURRE;         :

2

# Exhibit 4

Case 1:21-cv-04106-AMD-RER Document 778 Filed 09/28/22 Page 3 of 177 PageID #: 16193

VIBE ENTERPRISE, INC.; SOFITEL TRADING :
CORP; FRANCY BEDOYA; SKYLINE WORLD :
GROUP INC.; MARIA BEDOYA; ELITE :
DISTRIBUTION INC; SAM KESSLER; AVI :
KESSLER; THE PRECIOUS METALS GROUP :
INC.; MADISON BULLION LLC; GREEN :
CAPITAL INVESTORS LLC; IGOR AMINOV; :
GOLD TOWER REFINERY INC.; ALL :
  AMERICAN HEAVY EQUIPMENT IMPORT & :
 EXPORT, LLC; ALEXANDER ORRIOLS; BLUE :
SEA MARINE INC.; ALEX GALVAN; AMG :
LOGISTICS SKY LLC; POWER PRO :
  LOGISTICS LLC; M & D CO. DISTRIBUTORS, :
LLC; LILIANA TERESA SAMPAYO MENA; :
MDSD ENTERPRISES LLC; FRANCIS FATA; :
ASCAN PHARMACY INC.; STANISLAUS :
MGBEOJIRIKWE; LACONIA AVENUE :
PHARMACY CORP.; and YISEL LOPEZ, :
                                   :
                                   :
                 Defendants, and :
                                   :
SWETHA   KETINENI;   BABASHILOH :
ENTERPRISES   LLC;   5   CONTINENTAL :
VENTURES LLC; AP FUNDING LLC; 441 :
WILLIS AVE LLC; LA VIE JEWELS OF NY :
LLC; AG WORLDWIDE SALES, INC.; AND :
ETZHAIM INC., :
                 Relief Defendants. :
----------------------------------------------------------- X

## CORRECTED FOURTH AMENDED COMPLAINT

Plaintiffs Gilead Sciences, Inc., Gilead Sciences Ireland UC, and Gilead Sciences, LLC

(together, "Gilead" or "Plaintiffs"), by and through their counsel, Patterson Belknap Webb &
Tyler LLP, for their Fourth Amended Complaint against the Defendants listed above and in the
Appendix attached hereto, allege as follows:

## SUMMARY OF THE ACTION

1.      In this action, Gilead seeks to put an immediate and permanent stop to

Defendants' knowing and willful manufacture, sale, marketing, and distribution of counterfeit

3

# Exhibit 4

Case 1:21-cv-04106-AMD-RER Document 778 Filed 09/28/22 Page 7 of 177 PageID #: 16197

11.     Finally, the "Asset Holder Defendants" are a series of money launderers, including shell companies, purported gold dealers, and cell-phone scammers (the "Asset Holder Defendants") who laundered the conspiracy's ill-gotten gains and obfuscated the massive illegal profits being earned by the Kingpin Defendants and their co-conspirators.

12.     In this action, Gilead seeks injunctive relief, including a seizure at certain Defendants' premises, in order to put an immediate stop to the sale of these dangerous counterfeit medications. Gilead also seeks other injunctive and monetary relief against all Defendants for trademark infringement in violation of Section 32 of the Lanham Act (15 U.S.C. § 1114); false descriptions and false designations of origin in commerce in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125); trademark dilution in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125) and New York General Business Law § 360-1; deceptive business practices in violation of New York General Business Law § 349; common-law unjust enrichment and unfair competition; engaging in a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c); and conspiracy to engage in a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(d).

<u>THE PARTIES</u>

13.     A list of the parties to this action, and of the Defendant Groups referred to here, is presented in Appendix A hereto, which is hereby incorporated into this Fourth Amended Complaint as if fully set forth herein.

A.     PLAINTIFFS

14.     Plaintiff Gilead Sciences, Inc. is a public corporation organized under the laws of the State of Delaware, with more than 12,000 employees. Its principal place of business is 333 Lakeside Drive, Foster City, California 94404. Gilead develops and markets a large portfolio of

7

# Exhibit 4

332.    My Meds' pedigrees for the Gilead counterfeits all fraudulently list "M&D Specialty Wholesalers" as My Meds' source of the medication. "M&D Specialty Wholesalers" is a fictitious name intended to be confused with, and trade on the name of, a legitimate wholesaler, "M&D Specialty Distribution."

333.    My Meds also funneled its counterfeiting proceeds through a series of shell companies that mimicked the name of this legitimate distributor, creating what would appear at first glance to be a legitimate financial trail for the medication.

334.    For example, My Meds sent over $11 million in its counterfeiting proceeds to a shell company: Asset Holder Defendant M & D Co. Distributors, LLC. That shell company was created by the other principal of My Meds, Defendant Vina, and it proceeded to pay over $8 million of those proceeds to Vina himself. Another such shell company receiving these proceeds is Asset Holder Defendant MDSD Enterprises, LLC—MDSD being a common abbreviation for the legitimate distributor.

15.    ITC Group and Its Principal, Frank Betancourt

335.    Supplier Defendant ITC is a fly-by-night counterfeiter that sold counterfeits to Distributor Defendants Scripts. Beginning about October 16, 2020, and through about October 12, 2021, ITC sold at least 3,730 counterfeit bottles of Gilead-branded medication to Scripts for over $10.6 million. All of the pedigrees associated with these bottles are counterfeit. As with the other Supplier Defendants, ITC has shuttered its doors and abandoned its office space.

336.    ITC was not, and was never intended to be, a legitimate pharmaceutical wholesaler. Instead, it was created as a means to traffic counterfeit medications. ITC was founded on June 26, 2020 and received licensure as a pharmaceutical wholesaler in New York on November 16, 2020.

# Exhibit 4

337.

In or about October 15, 2020, a month before ITC obtained its wholesaler license in New York, Leader Defendant David Dunn introduced ITC's principal, Betancourt, to Scripts' owner, Defendant Steven Diamantstein. Betancourt and Diamantstein began corresponding that same day. Scripts and ITC entered into a Vendor Agreement the following day.

338.    Thereafter, ITC and Betancourt relied on Scripts and Diamantstein for instructions regarding the process of setting up a company that had the appearance of being a legitimate wholesaler in order to sell counterfeits.

339.    For example, in their first written conversation, Betancourt texted Diamantstein, asking basic questions about how to get licensure, such as "Do we need to apply in NYC or Jersey?" to which Diamantstein responded, "NY State." In the same conversation, Mr. Betancourt asked Diamantstein to name "someone we can use as a registered agent in NYS." Betancourt also pressed for Scripts to begin making purchases immediately, despite the then-lack of wholesale licensure.

340.    As soon as ITC's New York license went through on November 16, 2020, Scripts placed its first order for counterfeit Gilead-branded HIV medications from ITC.

341.    The counterfeit pedigrees that ITC sent Scripts throughout the course of their transactions were sloppy and plagued with glaring problems, resulting in a stream of complaints from Scripts. Some of the glaring problems Scripts identified included pedigrees that listed the same date of sale for every transaction from the first supposed sale by Gilead through the final sale to Scripts, pedigrees that did not even list the sales to Scripts, and pedigrees that did not list lot numbers and had incorrect quantities. Scripts and Diamantstein worked with ITC and Betancourt to revise those counterfeit pedigrees to make them more plausible.

# Exhibit 4

to Scripts, this time asking for information about Abacus. Clearly alarmed, Scripts pushed back, writing: "Why has your investigation now morphed into another supplier and customer of Scripts?" The FDA responded: "Our job is to determine breaches in the supply chain. Investigative research has led us to another supplier" – *i.e.*, Abacus.

488.   True to form, within two days of the FDA Office of Criminal Investigation identifying Abacus as a suspect, Scripts had willfully sold all of its remaining stock of counterfeit Gilead-branded medication from Abacus to a retail pharmacy, clearing out its warehouse of some 370 bottles, and ensuring that those counterfeits would end up in the hands of hundreds of patients, and not the FDA. Also true to form, knowing the FDA was onto Abacus, Scripts abruptly stopped buying from Abacus and moved on to purchase from other counterfeit suppliers.

489.   Scripts' owner, Steven Diamantstein, was personally involved in and personally supervised and authorized Scripts' purchase and sale of counterfeit Gilead-branded HIV medication. For example, as noted above, Diamantstein testified that it was his decision to sell the Mainspring counterfeits after Mainspring's principal was arrested and indicted. Diamantstein also corresponded directly and regularly with the Leader Defendants about Scripts' purchase and sale of the counterfeits. For instance, Diamanstein directly communicated with Dunn and Ralhan via calls and texts regarding placing and fulfilling orders to pharmacies for Gilead-brand medications and corresponding payments. Diamanstein also communicated with the Leader Defendants and Supplier Defendants regarding Scripts' purchases of the counterfeits—for instance, Dunn connected Diamantstein to Frank Betancourt, the principal of Supplier Defendant ITC Group. Diamantstein thereafter continued conversations with ITC on his own and went so far as to advise Betancourt how to set up shop, including where to obtain wholesaler licenses and

# Exhibit 4



# Exhibit 4



# Exhibit 4



Exhibit 4



# Exhibit 5

**Severability**

13. The clauses and paragraphs contained in this Agreement are intended to be read and construed independently of each other. If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the parties' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

**General Provisions**

14. Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

**Entire Agreement**

15. This Agreement constitutes the entire agreement between the parties and there are no further items or provisions, either oral or otherwise.

**IN WITNESS WHEREOF**, the parties have duly affixed their signatures on this 28th day of June, 2023.

**SIGNED, SEALED, AND DELIVERED**
this _____ day of _____,
_____

_____
Julio Cruz


**SIGNED, SEALED, AND DELIVERED**
this _____ day of _____,
_____

_____
Ronald Farah

# Exhibit 5



Re: Rubio v. Algo Capital, et al

Hi,

Please send me the full version of the loan agreement between Ronald Farah and Julio Cesar Cruz; also, where're my discovery items I requested please?
Thank you.

Sincerely,
Armando Rubio
786-778-1865
Founder & Managing partner of Tribal & US Markets
Vanguard Health Management LLC

The contents of this presentation and any attachments are confidential and are intended solely for addressee. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, any use, reproduction or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender by reply e-mail or phone.

Exhibit 6



# Exhibit 6



# Exhibit 6



# Exhibit 6



# Exhibit 6



# Exhibit 6

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

ARMANDO RUBIO,

       Plaintiff,

v.                                    Case No.: 23-cv-24476

ALGO CAPITAL, LLC, a Florida
Corporation, K SUNSET CONSULTING,
INC., a Florida corporation, KATO GROUP,
LLC, a Wyoming limited liability corporation,
ROBERT D. COLLAZO, JR., RYAN HERMAN
JULIO CESAR CRUZ, and JULIAN CRUZ,
all in their individual capacity

       Defendants.

---

## AFFIDAVIT

BEFORE ME, the undersigned authority personally appeared Robert Collazo who, after

being duly sworn deposes and says:

1. That my name is Robert Collazo, I am over the age of majority and a resident of

Miami Dade County, Florida.

2. I am a defendant in the above-entitled cause

3. I am a partner of Algo (hereinafter "Algo") located at 12301 N.W. 112th

Avenue, Suite 114, Miami, Florida 33178

4. In or about December 2021, Julio Cruz appeared for the first time at our office seeking

information about our company. He was accompanied by a man I later came to know

as Armando Rubio. This was the first time Mr. Rubio had ever previously had any contact with

before that time. Mr. Cruz wanted to become a prospective client of Algo. Account

Representative also participated with me in the providing the

information requested.

5. We both explained that Algo is not related to Julio Cruz and/or namesake Ryan

6. Since then there is no issue with Traders Domain under the

Florida corporation.

7. Mr. Cruz was solely the account holder of Traders Domain. He has

neither been an agent, officer, director, member, employee, "feeder fund" or

representative of Algo and has never rendered any services to Algo and has never

been paid or compensated for any services rendered.

Scanned with CamScanner

# Exhibit 6

been paid any monies by Algo for services rendered.

8. In or about August 2022, Armando Rubio requested that an account be opened for him. Mr. Rubio advised us that he was anxious to start immediately and didn't want to wait to do so, and that Mr. Cruz had agreed to accommodate him by "parking" Mr. Rubio's initial investment and any profits in Mr. Cruz' Traders Domain Account. Mr. Cruz approved the procedure.

9. A few months later, Mr. Rubio advised Traders Domain that he desired to withdraw his capital and avoid any waiting period, that he had arranged for Mr. Cruz to pay him from Mr. Cruz' account. After Mr. Rubio advised that Mr. Cruz paid him in full, Algo, pursuant to Mr. Rubio's prior authorization, transferred the funds in his account to Mr. Cruz' account. Mr. Rubio never transacted with us again.

10. In or about March 2023, Mr. Rubio contacted me seeking a transfer of $670,000.00 to his Traders Domain account, to be funded and drawn from Mr. Cruz' Traders Domain account. He stated that Mr. Cruz had authorized the transfer. I contacted Mr. Cruz to determine his position on the request. Mr. Cruz advised me that he was no longer speaking to Mr. Rubio, their relationship had been terminated in February 2023. He said that this was the first time he had ever heard of any debt owed to Mr. Rubio, especially such an extraordinary one of $670,000.00. He said he had never received anything from Mr. Rubio in exchange for and which could support such a request, and that did not owe Mr. Rubio any money.

11. Mr. Cruz asked me to request support underlying the request from Mr. Rubio. I asked Mr. Rubio for a document authorizing such a transfer, and when he said he did not have any documents to support his request, I reported that to Mr. Cruz. Mr. Cruz refused to transfer anything from his account to Mr. Rubio's account.

12. At no time did Julian Cruz, Julio Cruz' son, ever work for Algo in any capacity. Mr. Julian Cruz has never been either an agent, officer, director, member, employee, etc., or a representative of Algo. He has neither provided any services to Algo, nor has he ever been paid any monies by Algo for services rendered.

13. FURTHER AFFIANT SAYETH NOT.

_____
ROBERT COLLAZO


STATE OF FLORIDA )
ss:
COUNTY OF MIAMI-DADE )


SWORN TO AND SUBSCRIBED before me this 30 day of August 2024.

My commission expires: April 30, 2027

_____
NOTARY PUBLIC, State of Florida at Large

PEDRO L. QUINTERO JR.
Notary Public - State of Florida
Commission # HH 392574
My Comm. Expires Apr 30, 2027


_____ Personally Known Or
✓ Produced Identification

# Exhibit 6

FL DL _____ **Type of Identification**

# Exhibit 6

**AFFIDAVIT**

BEFORE ME, the undersigned authority personally appeared Kenny Winn who, after being duly sworn, deposes and says:

1. My name is Kenneth Winn, I am over the age of majority, and I am a resident of Clarke County, Las Vegas, Nevada.

2. That in or about 2021, I learned that my friend, Julio Cruz, had invested in an algorithm owned by Algo Capital, LLC. which was extremely profitable.

3. After I conducted some research, I too became very interested in investing in Algo Capital, LLC algorithm.

4. I became partners in Julio Cruz' Algo account and ultimately invested approximately $670,000.00.

5. I am also familiar with Armando Rubio whom I met through Julio Cruz. Mr. Rubio was someone who held himself out as a successful financier.

6. After Mr. Rubio and Mr. Cruz ended their friendship in February 2023, Mr. Rubio contacted me about joining him in a lawsuit against Julio Cruz and Algo Capital, LLC. and its officers; I declined.

7. Before Mr. Rubio had filed the federal lawsuit against Algo, Julio Cruz and others, he called me again to claim Mr. Cruz was a fraud and asked me to fly to Miami to meet with him and other investors whom he claimed Mr. Cruz had defrauded. He said the purpose of the meeting was to gather documents and any additional information to use to build a case against Mr. Cruz.

8. Shortly after my arrival and meeting with Mr. Rubio and his attorney's paralegal it became clear to me that Mr. Rubio had no other investors which he claimed to have during our phone call.

9. Within a few weeks after meeting with Mr. Rubio and the paralegal it became evident to me that Mr. Rubio had lied to me during our phone conversation about everything. I realized that Mr. Rubio had no documents, and or other investors to support his case when he asked me for my documents from my investment in Algo, that he wanted to use them as a template for a lawsuit against Mr Cruz and Algo.

# Exhibit 6

10. And when he also asked me to pay 50% of his legal fees, I realized he had also been lying about being a successful financier.

11. I declined to make copies of my documents about the Algo investment, and I told Mr. Rubio that I wanted no part of that conduct. I also declined to contribute money to pay his attorneys.

12. I have not spoken to or heard from Mr. Rubio since refusing to provide him with copies of my investment documents in Algo.

**FURTHER AFFIANT SAYETH NAUGHT.**

KENNETH WINN

**STATE OF NEVADA )**

**SS:**

**CLARKE COUNTY  )**

SWORN TO AND SUBSCRIBED before me this __10__ day of September 2024.

NOTARY PUBLIC, State of Nevada at Large

My Commission Expires
05-03-2028

BENJAMIN ACUNA
Notary Public, State of Nevada
No. 24-0406-01
My Appt. Exp. May 3, 2028

_____ Personally Known Or

__X__ Produced Identification

_Nevada drivers License_____ Type of Identification

# Exhibit 6



JT
Jay

Did you really do 230k in trades today

**100%**

No wander you are mia lol

**I TOLD YOU**

This is why I wanted you to fly out here

**So numbers were corrected**

**But still a profit**

# Exhibit 6



**Jay**

**Buenos dias señor**

**Tomorrow**



**Meeting w Robert tomorrow as well**

> Yeah I've talked to Robert as well and he said that the only money he is responsible for is 450k because that's all you gave him all together

Read 9:19 AM

**No I have him $550 but**

 

**Gave him $550 but we will address that tomorrow** 

# Exhibit 6

**AFFIDAVIT OF JORGE MANZANO**

**STATE OF Florida**
**COUNTY OF Miami Dade County**

I, Jorge Manzano, being duly sworn, hereby depose and state:

1.  **Affiant's Identity:** My name is Jorge Manzano, and I have personal knowledge of the facts set forth in this affidavit.
2.  **Relationship with Julio Cruz:** I had a very casual relationship with Julio Cruz. Our interactions were sporadic and primarily business-related.
3.  **Meeting in Early Fall of 2022:** In early Fall of 2022, Julio Cruz approached me in a state of distress during a meeting. He was visibly upset and expressed significant anger and disappointment concerning his son, Julian Cruz, who is the Chief Technology Officer (CTO) at Algo Capital.
4.  **Concerns About Algo Capital:** During this encounter, Julio Cruz confided that his son, Julian, had raised concerns about Algo Capital potentially operating as a Ponzi scheme and committing fraud. Julian Cruz expressed his intention to report these concerns to the Federal Bureau of Investigation (FBI).
5.  **Request to Delay Reporting:** Julio Cruz implored his son not to report these concerns to the FBI immediately. He expressed a need to withdraw his investments from Algo Capital before any potential investigation could commence, fearing legal repercussions and financial losses.
6.  **Previous Business Dealings:** Several months prior to this discussion about his son, Julio Cruz had visited my office with the intent to sell his part of his account at Algo Capital. I was accompanied by Alex, my partner, during this visit.
7.  **Knowledge of Fraudulent Activities:** It was apparent from our interactions that Julio Cruz was aware of fraudulent activities associated with Algo Capital. He was constantly trying to sell his account to myself and others; promoting the company as if he had a fiscal interest in doing so.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 5 day of 6, 2024 at

*[signature]*

[Signature of Jorge Manzano]

Jorge Manzano

# Exhibit 6

Subscribed and sworn to before me this [day] day of [month, year] by Jorge
Manzano who is personally known to me or has produced [type of identification] as
identification.

[Signature of Notary Public]

Mauricio A. Botero.

[Printed Name of Notary Public]

06/05/2024

Mauricio A Botero
Comm. HH 159413
Expires. Aug. 1, 2025
Notary Public - State of Florida

[Notary Seal]

# Exhibit 7



62

Rob, good afternoon brother,
Given our last convo, I remember you
had mentioned that it was not going to
be necessary to file lawsuit against
Julio, but when can you guys  give me
my principal  $670k?

 Please let me know. I know Orlando
wants to set up this trading account
offshore, raise money and have Jj
trade it, are you guys still doing that?
 Please call me when you can,  I would
like to go over some additional stuff.
thank you

Hey at kids games.

Call you back

Brother good evening,
 Can we please have breakfast
tomorrow in the am?

What area are you in

we can have breakfast at four season
in surfside, if that's convenient for you

# Exhibit 7



# Exhibit 7



62

Rob good morning, can you please send me an acknowledgment letter regarding the status of the investment account, and how algo is committed to the agenda you illustrated to me; with my principal of $670k, for the sake of record keeping. Thank you

Hey sorry my kid was using cell lol

Call you in the morning about text

No problem my brother, I'm looking forward to it

GM! Are you available for a call?

Good afternoon!
Were you able to speak with legal regarding the letter illustrating what's Algo's current plan with my investment? Please keep me updated

# EXHIBIT 7

## United States Court of Appeals
### FOR THE EIGHTH CIRCUIT

No. 06-3409

| | |
|---|---|
| United States of America, | |
| Appellee, | |
| v. | Appeal from the United States District Court for the Western District of Missouri. |
| Iggy Santisteban, | |
| Appellant. | |

Submitted: May 17, 2007
Filed: September 7, 2007 **(Corrected 9/17/07)**

Before MURPHY, HANSEN, and COLLOTON, Circuit Judges.

COLLOTON, Circuit Judge.

After a four-day trial, a jury convicted Iggy Santisteban of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. The district court[1] sentenced Santisteban to a prison term of thirty-seven months. Santisteban appeals several of the district court's rulings at trial, and we affirm.

---

[1] The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

# EXHIBIT 7

I.

Santisteban was involved in an international conspiracy to manufacture and distribute counterfeit prescription drugs. The conspiracy involved importing, manufacturing, and misbranding prescription drugs. Santisteban's printing business produced labels for the counterfeit drugs, and accepted payment from the other conspirators for the fraudulent labels.

Santisteban's defense at trial was that his participation was unwitting. The central figure of the conspiracy was Julio Cruz, a former cocaine dealer, whose cooperation with the government in an unrelated case had enabled him to leave prison early. After securing his release, Cruz, with the assistance of two men he had met in prison, began smuggling prescription drugs into the United States from Central and South America. The conspiracy also involved the theft and unauthorized manufacture of prescription drugs.

Before meeting Cruz, Santisteban owned a struggling printing business in South Florida, known as Iggyprints. A mutual friend introduced Cruz to Santisteban, and at this meeting, Cruz asked Santisteban if he could reproduce a label for Pfizer's anti-cholesterol drug Lipitor. After stating that he could re-print the label, Santisteban quoted a price for printing labels, at about 50% above what he typically would have charged. Cruz immediately agreed. Cruz testified that Santisteban requested a purchase order, or some other documentation, to authorize his reproduction of the labels. When FDA agents initially questioned Santisteban, he told them that he had received a letter on Pfizer stationery authorizing him to go ahead with the print job, but he could not retrieve this document for the agents. Later, he produced a letter written on Pfizer letterhead, although the heading indicated that it was from Pfizer in Brazil, and the text of the letter merely requested "a competitive quote," not the printing of labels. Santisteban eventually printed over forty different drug labels at Cruz's direction, including labels for non-Pfizer drugs. Santisteban came to the

-2-

# EXHIBIT 7

attention of law enforcement during the course of an investigation into counterfeit Lipitor and Lipitor labels.

The jury convicted Santisteban of conspiring to defraud the United States. The theory of the prosecution was that the conspiracy evaded the Food and Drug Administration's regulatory control and thus defrauded the United States. The district court sentenced Santisteban to a term of thirty-seven months' imprisonment, and ordered restitution of $1,806,905 to Pfizer.

## II.

## A.

Santisteban's first contention is that the government violated his rights under the Due Process Clause by failing to disclose certain impeachment evidence. Before trial, the government disclosed to the defense a prosecution memorandum, which outlined the government's case. Santisteban argues that the government violated his rights by refusing to disclose certain investigative reports that provided the basis for portions of the memorandum.

Santisteban's defense was that he believed Cruz to be a legitimate businessman, and that he relied on the Pfizer letter as authorization for the reproduction of labels for Pfizer drugs. At trial, however, Cruz testified that Santisteban had requested the letter merely to "cover his ass," and not because he believed it actually authorized the reproduction of labels. Cruz testified that he gave Santisteban the letterhead, which included a signature, but that the body of the letter was blank when he gave the letterhead to Santisteban. On cross-examination, Cruz testified that Santisteban had forged and backdated the body of the letter.

-3-

# EXHIBIT 7

Contrary to Cruz's testimony, however, the prosecution memorandum suggests that Santisteban did not forge the body of the letter from Pfizer. Instead, it states that Pablo Fernandez, one of Cruz's associates, "created a fake/forged authorization letter . . . and Cruz furnished it to Santisteban." When Santisteban sought discovery of agent reports of Cruz's statements, believing that these would reveal the source of the apparent inconsistency, the government refused to provide them. The district court rejected Santisteban's claim that the prosecution memorandum provided a foundation for further discovery, concluding that there was no clear inconsistency between the prosecution memorandum and Cruz's testimony. Cruz had testified that he had provided the letterhead, and that Santisteban forged the body of the letter and backdated it. The court reasoned that the prosecution memorandum may have referred only to the creation of the letterhead, and not to the forgery of the body of the letter.

The Due Process Clause of the Fifth Amendment requires the government to disclose to the accused favorable evidence that is material to guilt or punishment and not otherwise available to the defendant. *See United States v. Bagley*, 473 U.S. 667, 678 (1985); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To prove a violation, the defendant must show that the evidence was both favorable and material, and that the government suppressed the evidence. *United States v. Barraza-Cazares*, 465 F.3d 327, 333 (8th Cir. 2006). The government has suppressed evidence when it was otherwise unavailable to the defendant, and the prosecution failed to disclose the evidence in time for the defendant to use it. *Id.* at 334. Thus, "[t]he government does not suppress evidence in violation of *Brady* by failing to disclose evidence to which the defendant had access through other channels." *United States v. Zuazo*, 243 F.3d 428, 431 (8th Cir. 2001).

Santisteban argues that the government violated the *Brady* rule by refusing to provide him with the agent reports that were the basis for the memorandum's assertion that Fernandez, and not Santisteban, forged the letter from Pfizer. We agree with Santisteban that the substance of the memorandum was inconsistent with Cruz's